Argued and submitted July 31, 2018, affirmed October 16, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANIEL CHRISTOPHER T. WYANT,
*Defendant-Appellant.*

Washington County Circuit Court
C142638CR; A162127

452 P3d 471

Defendant appeals, challenging a conviction for murder. On appeal, defendant assigns error to the trial court's admission of the victim's out-of-court statements in text messages and an email sent to defendant on the basis that (1) the evidence was inadmissible hearsay, (2) admission of the evidence violated the confrontation clause of Article I, section 11, of the Oregon Constitution, and (3) the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under OEC 403. Defendant also challenges the court's admission of testimony from his ex-wife on the basis that all of the ex-wife's testimony was (1) irrelevant under OEC 401 and (2) inadmissible under OEC 403. Finally, defendant assigns error to the court's failure to cure "prejudice" caused by the prosecutor's closing arguments. *Held*: The trial court did not abuse its discretion or otherwise err in admitting the victim's emails or text messages. The Court of Appeals does not address any error regarding the testimony of defendant's ex-wife because defendant did not preserve his objection to all of her testimony and did not comply with ORAP 5.45 with regards to the objections that he did preserve. The Court of Appeals also rejects defendant's assignments of error regarding the prosecutor's closing arguments without discussion.

Affirmed.

Suzanne Upton, Judge.

Morgen E. Daniels, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.*

_____

* Egan, C. J., *vice* Garrett, J. pro tempore.

EGAN, C. J.

Affirmed.

**EGAN, C. J.**

Defendant appeals from a conviction for the murder of his former romantic partner. At trial, defendant did not dispute that he shot and killed the victim; instead, he argued that he should be found guilty except for insanity under ORS 161.295 (1983), *amended by* Or Laws 2017, ch 634, § 3. The jury did not accept that contention. In seven assignments of error, defendant challenges the trial court's admission of the victim's out-of-court statements in text messages and emails sent to defendant, its admission of testimony from one of defendant's ex-wives, and its failure to cure "prejudice" caused by the prosecutor's closing arguments. As to defendant's assignments of error regarding the prosecutor's closing arguments, we reject them without discussion; as explained below, we also reject defendant's remaining assignments of error.

## I.   FACTUAL BACKGROUND

Before meeting the victim, M, defendant had been married twice and had suffered a major brain injury. In 1994, defendant was married to L. Getskow. Defendant was in the U.S. Army at the time, and he was stationed in Germany in 1996. While he was abroad, Getskow informed defendant that she wanted a divorce. Defendant did not want a divorce, and he responded by calling Getskow repeatedly, writing her beseeching letters, lying to her that he had leukemia, and sending her a drawing of her and their two children standing sadly at his grave. Ultimately, the two were divorced in 1999, and defendant later terminated his parental rights to their two children.

In 1997, defendant had suffered a traumatic brain injury (TBI). As a result, defendant developed an ongoing seizure disorder, suffered from migraine headaches, and had memory problems.

In 2003, defendant married his second wife, H. Wyant. The two had a good relationship, but divorced amicably in 2011. They remained friends.

Defendant met M online in early 2014, when defendant lived in Illinois and M lived in California. About six

months later, the couple moved together to Oregon. Their relationship was difficult, and they fought and reconciled repeatedly.

In August of 2014, defendant's migraines worsened, and he went to the Veteran's Administration (VA) for treatment. The doctor performed tests that showed that defendant had been having seizures, and he prescribed Topiramate for defendant's headaches. Topiramate is an anti-seizure medication that alters brain chemistry and has been associated with side effects such as suicide, anxiety, depression, mood disorders, irritability, hostility, aggression, and psychosis.

The next month, M moved out of the apartment she shared with defendant. M sent defendant an email saying that she did not feel safe and that she "had to end" their relationship. She asked defendant not to contact her. M continued to communicate with defendant over text messages, however, and defendant expressed that he wanted M to move back in with him. When defendant learned that M was seeing another man, he texted and called her repeatedly, ranging from pleas for reconciliation to anger and contention. He also posted sexually explicit images of M on the internet and falsely reported to the police that M had stolen prescription medicine from him. Defendant also forwarded M's breakup email to his mother and H. Wyant, his second ex-wife.

M arranged to retrieve the rest of her belongings from defendant's apartment on November 2, at a time when defendant said he would not be there. M brought members of her family and friends to help her. When they arrived, defendant was there. While M was packing a box, defendant crouched next to her and they began to argue. A short time later, one of M's friends heard M yell, "What are you doing?" and saw her backing into the kitchen with her hands up. Defendant shot M three times, and said, "This is what happens when you fuck with me." He then shot himself in the head. Defendant tried to get up off the floor and asked one of M's friends to "Shoot me. Shoot me. Just please shoot me." M died from her wounds, any one of which could have been fatal. Defendant survived.

Defendant was charged with one count of murder. Before trial, defendant filed notice to rely upon the defense of mental disease or defect, or guilty except for insanity (GEI) pursuant to ORS 161.295 (1983). At the time defendant committed his crime, that statute provided:

"(1)   A person is guilty except for insanity if, as a result of a mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2)   As used in chapter 743, Oregon Laws 1971, the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

ORS 161.295 (1983).[1] Thus, at trial, defendant sought to introduce evidence showing that he suffered from a mental disease or defect. The state introduced evidence to rebut that defense, including the email from M to defendant, text messages exchanged between defendant and M, and testimony from defendant's first ex-wife about his conduct during their marriage that had ended 20 years prior to the events at issue in this case. The state hoped to "refute that he couldn't appreciate the criminality of his conduct" and to show that he was capable of intentionally committing the alleged crime. Ultimately, the jury rejected defendant's GEI defense and convicted him of murder.

On appeal, defendant contends that the trial court erred in seven assignments of error, five of which we address, in turn. Defendant argues that the trial court erred when it denied his motions (1) to exclude M's out-of-court statements contained in text messages; (2) for a mistrial after a forensic examiner testified that the text messages were a "fair representation" of defendant and M's relationship; (3) to exclude the email written by M and forwarded by defendant; (4) for a mistrial due to the prejudice caused by the state's use of M's

---

[1]  We use the statutory terms in effect at the time of trial. In 2017, legislative amendments replaced the term "mental disease or defect" in several statutes with the term "qualifying mental disorder." Or Laws 2017, ch 634, §§ 3, 4. All references are to the version of the statute in effect at the date of the crime.

email; and (5) to exclude testimony from Getskow, his first ex-wife. As we explain below, we disagree with defendant's arguments and affirm.

## II.   THE TEXT MESSAGES

Before reaching defendant's arguments on appeal, we lay out the evidence at issue in his first four assignments of error in more detail, beginning with the text message conversations between M and defendant. Before trial, the state notified defendant that it would be offering a collection of text messages between defendant and M in an exhibit and through the testimony of a detective. The state's primary purpose in offering that evidence was to show that defendant's criminal conduct was not a result of a mental disease or defect. At the outset, defendant brought to the court's attention that he "[had] objections to the almost 400 messages" that the state intended to introduce, including some based on hearsay and some based on the confrontation clause. Defendant told the court that he had discussed the admissibility of the evidence with the state, and agreed that "the vast majority" of the messages would come in. Nonetheless, "as a precursor," defendant explained that he had "been able to identify a series of [the statements] that [he thought were] objectionable." Defendant's main concern was that the trial was going to "become a firsthand account of the relationship between [defendant and M]," and that the state was "garnering a lot of testimony from a witness who [was] not going to be present in the courtroom ***." Therefore, defendant brought "firm objections" to several sections of the text message conversations.

First, defendant objected to the following text message exchange:

"[M]:   My phone is fucked.

"[DEFENDANT]:   It doesn't work?

"[M]:   It works, but it is super buggy and the screen still has water in it.

"[DEFENDANT]:   I don't get it. I realize how it looks considering last night when it happened, but I promise I didn't do anything to your phone."

Defendant objected, arguing that (1) the evidence was inadmissible hearsay, (2) admission of the evidence violated the confrontation clause of Article I, section 11, of the Oregon Constitution, and (3) the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under OEC 403. Before hearing from the state, the court noted that it was "going to be a tricky area for the court to rule on" and told both sides that it "would be willing to consider" a jury instruction regarding M's messages. The state then explained that it was not relying on M's messages for their truth; rather, it was relying on her messages for the effect they had on defendant and to put defendant's responding messages in context. The court denied defendant's motion to exclude that text message exchange.

Next, defendant objected to another text message conversation between M and defendant, making similar arguments. That conversation occurred after the couple had ceased living together and were having significant relationship difficulties:

"[DEFENDANT]:  If you come and talk tonight, I promise I won't bug you for a week.

"[M]:  It will not be okay, because I will not be okay.

"[DEFENDANT]:  Let's just go get some food and talk like old times."

Defendant argued that, though the state was likely right that M's statement could be admitted under the hearsay exception of "effect on the listener," it should be excluded because it was irrelevant under OEC 401 and because its probative value was substantially outweighed by the danger for unfair prejudice under OEC 403. The court responded that the statement was "more than just effect on the listener." Because defendant's text messages were admissible, the court explained that there would be "no meaning to them without the back and forth, in all of its mundane, and everything else." Accordingly, the court denied defendant's motion to exclude that conversation.

Defendant proceeded to identify another conversation that had occurred after he and M had separated, and in which they were discussing meeting. M suggested a park,

but defendant wanted to meet at their formerly shared apartment, where he was more comfortable. M responded: "I don't want to do this where I'm not comfortable, either." Defendant moved to exclude that response, again arguing that it should be excluded under OEC 401 and OEC 403. The court denied defendant's motion.

The next conversation defendant objected to happened after M and defendant had met at the park to talk:

"[DEFENDANT]: Come back and come in and help me, please.

"[M]: I only have three percent battery left.

"[DEFENDANT]: Help.

"[DEFENDANT]: Come back and let's part amicably.

"[M]: I'm scared, Daniel."

Defendant argued that M's message about being scared should be excluded because it didn't "seem responsive" because it was sent an hour and 43 minutes after defendant's prior message. The state responded that M's message was part of a "full body" of work and that "context is everything." The court agreed with the state.

Finally, defendant moved to exclude two additional messages from M "in accord with [his] *** previous argument." The first was a series of three messages from M, in which she stated,

"I don't want to be with you, Daniel. It doesn't matter what my mom or any other fucking dude or you have to say. It's how I feel. The more I [*sic*] try to convince me to give you another chance or argue that you never got a chance, it's going to make me want to do it less. Leave me alone."

The second came during one of the final exchanges between defendant and M:

"[DEFENDANT]: I made no threatening remarks towards your family.

"[DEFENDANT]: Your family was rooting for me.

"[M]: You said you might be okay. Just remember that your family is vulnerable. That is the threat that we worked through with Ms. Fox yesterday.

> "[DEFENDANT]:   No way. You must have misunderstood."

The court denied all of defendant's motions to exclude.

After the court had denied all of his motions, defendant supplemented the objections he had made, arguing that, because there were "so many text messages," the probative value was depleted for the ones that, he argued, were prejudicial. Defendant argued that the state was "turning the limited probative value against a highly prejudicial situation of allowing hearsay statements * * * of a witness that's unavailable for cross examination." The court responded that the statements were admissible, and that "to the extent that some of them are highly prejudicial * * * they're also extremely probative." Defendant then stated that though he "put on a series of text messages that [he] had [OEC] 401 and 403 challenges to," he also objected to "all of [M's] text messages coming in, pursuant to Article I, section 11[, of the Oregon Constitution]." The court overruled defendant's latter objection, but offered to instruct the jury, both during and at the end of trial, on its use of M's messages. Defendant did not request an instruction at that time, but did at the end of trial. The court instructed the jurors as follows:

> "LIMITING INSTRUCTION REGARDING OUT-OF-COURT STATEMENTS
>
> "You have heard evidence that included 'out-of-court' statements made by persons who did not testify at trial.
>
> "These include spoken, written, and electronic communications by [M] and others.
>
> "Unless specifically noted, these statements cannot be considered to prove the truth of what was asserted in the statement.
>
> "The Jury may consider such statements for other reasons, including;
>
> "a)   The effect the statement had on a listener or receiver;
>
> "b)   To provide context so that the response is understandable;

"c)   To aid an expert in reaching their opinion;

"d)   To impeach a witness at trial."

The manner in which the above text messages were presented to the jurors is also relevant for defendant's appeal, particularly to defendant's second assignment of error. As previously mentioned, the exchanges were presented both as an exhibit and through testimony by a detective. After the detective completed his presentation, in cross-examination, defendant pointed out that the detective had not included "complete" conversations between defendant and M in his presentation; rather, he had picked certain portions of their conversations. On redirect, the state asked the detective, "[W]as your goal to provide sort of a *** fair representation of what's going on through the—the time period we're dealing with?" The detective responded, "Yes."

### III.   THE BREAKUP EMAIL

Moving to the evidence relevant to defendant's third and fourth assignments of error, those involve an email that was written by M to defendant and then forwarded by defendant to his mother and to H. Wyant, his second ex-wife. The email informed defendant that M was ending their relationship because she feared for her physical safety and mental/ emotional well-being. M also asked defendant not to contact her. That email was offered in several formats by the state: (1) as part of the state's presentation of M and defendant's history of text message and other online communications, (2) as two separate exhibits, first as a forwarded email to H. Wyant, and second as a forwarded email to his mother, and (3) as evidence to impeach H. Wyant.

### IV.   DEFENDANT'S ASSIGNMENTS OF ERROR REGARDING THE EMAIL AND TEXT MESSAGES

On appeal, defendant, in a combined argument for his first four assignments of error, draws our attention to the trial court's denial of his motions to exclude M's text messages and email, and to its denial of his motion for a mistrial after the detective's testimony and after the state's use of M's email. The state, however, responds to each assignment of error separately. We do so as well.

A.   *Admission of the Text Messages*

Defendant's first assignment of error concerns the admission of M's text messages. Defendant argues that (1) the text messages were hearsay, because they were being offered for their truth, not for their effect on defendant; (2) even if the messages were admissible nonhearsay, they should have been excluded because the state did not meet the requirements of Article I, section 11; and (3) the messages also should have been excluded because the risk of unfair prejudice substantially outweighed the probative value.

The state first responds, and we concur, that defendant's hearsay and OEC 403 challenges are confined to the select portion of the statements that he objected to below, and that only the confrontation clause challenge was preserved as to all of the text messages. Next, the state argues that (1) relevant nonhearsay purposes supported the trial court's admission of the few text messages that defendant challenged as hearsay, (2) the court correctly concluded that none of the text messages violated Article I, section 11, and (3) defendant's limited OEC 403 objections were properly overruled.

We turn to defendant's hearsay argument. "Hearsay is a 'statement,' other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *State v. Schiller-Munneman*, 359 Or 808, 816, 377 P3d 544 (2016). An out-of-court statement is not hearsay, however, "if it is offered to show the statement's effect on the listener, and the effect on the listener is relevant." *Id.* at 817. We review a trial court's determination that a statement is hearsay for legal error. *State v. Cook*, 340 Or 530, 537, 135 P3d 260 (2006).

Defendant argues that the probative value of M's statements in her text messages depended on the factfinder accepting "the truthfulness of the *content* of the statements." (Emphasis in original.) To defendant, M's messages are not simply "context" for his messages because their content— that the relationship had deteriorated to the point that M

was afraid of defendant, that she did not trust defendant, and that she was uncomfortable around defendant and, therefore, rejected him—had to be credited by the jury. The state responds that the trial court correctly admitted M's statements because they were necessary to give meaning to defendant's own statements.

The state further argues that *State v. Davis*, 291 Or App 146, 419 P3d 730, *rev den*, 363 Or 481 (2018), disposes of defendant's argument. In *Davis*, we held that "the victim's statements in [a text message] conversation with defendant were themselves admissible as nonhearsay context for defendant's admissible statements." *Id.* at 159. Here, defendant does not dispute the admissibility of his own statements contained in the text message conversations with M. M's half of the text message conversations provided necessary context for the jury to understand defendant's corresponding half of the conversations. Therefore, pursuant to our holding in *Davis*, we agree with the state that M's text messages were admissible to provide context to defendant's statements and were, thus, not hearsay.

Defendant's next argument is that the admission of all of M's text messages violated his right to confront a witness under Article I, section 11. He argues that, regardless of whether M's statements were hearsay, the court erred when it admitted those statements without requiring the state to prove that the statements were "reliable" and to show "particularized guarantees of trustworthiness." The state responds that Article I, section 11, imposes a requirement of reliability only as to hearsay evidence. Therefore, because the court admitted M's statements for nonhearsay purposes, the state argues that the court correctly overruled defendant's confrontation-based objection.

Article I, section 11, imposes a requirement of reliability (and unavailability, which is not at issue in this case) only as to hearsay evidence. *State v. Moore*, 334 Or 328, 334, 49 P3d 785 (2002) ("[T]his court has continued to apply [the two-part test from *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980)] when a defendant alleges that the admission of *hearsay* violates his or her right to meet a witness face

to face[.]" (Emphasis added.)).[2] As we have just concluded, the specific statements that defendant objected to on the basis of hearsay were properly admitted as nonhearsay. Moreover, defendant has failed to identify any other portion of M's text messages that constituted inadmissible hearsay. Therefore, we agree with the state that the court properly overruled defendant's confrontation-clause objection.

Defendant's final challenge to the admission of the text message conversations falls under OEC 403. Under that rule, relevant evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." OEC 403. We review a trial court's determination that evidence is admissible under OEC 403 for abuse of discretion. *State v. Mazziotti*, 276 Or App 773, 780, 369 P3d 1200 (2016), *aff'd*, 361 Or 370, 393 P3d 235 (2017).

Defendant argues that, though M's text messages were "likely relevant to help illustrate defendant's state of mind in the weeks leading up to the shooting and to provide context for defendant's statements," they should nonetheless have been excluded. Defendant contends that the messages' probative value was substantially outweighed by the danger of unfair prejudice caused by the "great likelihood" that the jury would use the statements for their truth. In other words, defendant argues that the jury would use M's texts as proof that M had negative thoughts and feelings about her relationship with defendant, and as proof of defendant's behavior towards M. The state responds that the court did not abuse its discretion in concluding that the probative value of M's messages was not substantially outweighed by the danger of unfair prejudice, especially in light of the court's instruction to the jurors that they could not use M's messages for their truth.

We first reiterate our earlier conclusion that defendant preserved his OEC 403 objection only to the specific

---

[2] We do not suggest that all forms of nonhearsay are, in any sense, automatically admissible in the context of a confrontation clause challenge. Indeed, following *Ohio v. Roberts*, the U.S. Supreme Court has given little clear guidance regarding the interplay of the confrontation clause and the hearsay rules. *See* Joel R. Brown, *The Confrontation Clause and the Hearsay Rule: A Problematic Relationship in Need of a Practical Analysis*, 14 Fla St U L Rev 949 (2017). Thus, we leave the task of resolving that complex relationship for another day.

messages that he objected to before the trial court. Moreover, defendant conceded that the cumulative nature of the text messages made the *particular prejudicial* ones that he identified not very probative. Thus, defendant's argument on appeal that the "sheer mass and nature of the statements" was, in itself, prejudicial, is not well-taken. On appeal, we focus only on those text messages that defendant brought to the attention of the trial court. The trial court considered defendant's objection to each series of messages, and each time, concluded that their high probative value was not substantially outweighed by their prejudicial effect. The trial court acknowledged that it was a "tricky area" to rule on, and thus offered to instruct the jury both during trial and at the end of trial. Defendant declined the first jury instruction offer, but accepted the latter one. Furthermore, on appeal, defendant does not identify why the court's reasoning was deficient as to the admission of any particular statement. Accordingly, we are unable to say that the trial court abused its discretion in overruling defendant's OEC 403 objections.

B.   *Motion for Mistrial for Admission of the Text Messages*

Turning to defendant's second assignment of error, defendant argues that the court erred in denying his first motion for a mistrial, based on its admission of M's text messages. We review a trial court's denial of a motion for mistrial for abuse of discretion. *State v. Arreola*, 250 Or App 496, 500, 281 P3d 634, *rev den*, 353 Or 103 (2012).

On appeal, defendant contends that "the volume and emotional intensity of the disputed statements posed an obstacle to fairness that the court could not overcome with a jury instruction," and that, therefore, the court should have granted his motion for a mistrial. The state responds first by noting that defendant's argument on appeal is different than what he argued below. Indeed, at trial, defendant moved for a mistrial after the detective presenting the text messages to the jury affirmed that the text messages were a "fair representation" of M and defendant's relationship. Defendant argued to the trial court that the detective's comment invited the jury to rely on the victim's messages for their truth. In light of defendant's different argument on appeal, the state argues that defendant has failed to develop

an argument specific to the ruling in which the trial court denied his motion for a mistrial. Suffice it to say, we agree with the state. Defendant's argument on appeal fails to provide any legally sufficient reason as to why the court abused its discretion in denying his motion for a mistrial after the detective's statement.

C. *Admission of the Breakup Email*

Moving to defendant's third and fourth assignments of error, we briefly address the parties' arguments, as they are largely a reprise of defendant's challenge to the admission of M's text messages. For his third assignment of error, defendant argues that the admission of M's email into evidence was error because (1) the email was hearsay, (2) it violated his right to confront witnesses under Article I, section 11, and (3) the email's probative value was substantially outweighed by the danger of unfair prejudice under OEC 403. The state responds that the email was properly admitted into evidence. Furthermore, the state argues that any error in admitting the email was harmless because the substance of the email was admitted separately, without objection, when the detective read the entirety of the email for the jury. Thus, even if the court erred in admitting one of the separate exhibits containing the email, the state argues that the error was harmless. We agree with the state. Even if the court erred in failing to exclude the separate exhibits of the forwarded email, an issue we do not decide, any error was harmless because the substance of the email had already been presented to the jury as evidence without objection.

D. *Defendant's Second Motion for a Mistrial*

As to defendant's fourth assignment of error, defendant argues that the court erred in denying his second motion for a mistrial, which he made after the state used the email to impeach H. Wyant, who was a defense witness. We understand defendant's argument to be that the email was so prejudicial to defendant that no limiting instruction, or any other action by the trial court, for that matter, could have prevented the jury from using the email improperly. The state responds that, even assuming that the state's use of the email was somehow improper, a mistrial was

unwarranted. Again, we agree with the state. In light of the admission of the email as part of the detective's testimony and the court's limiting instruction, we cannot say that the court abused its discretion in declining to grant a mistrial.

## V.   DEFENDANT'S ASSIGNMENT OF ERROR REGARDING THE TESTIMONY OF GETSKOW

Finally, we address defendant's fifth assignment of error regarding the testimony of his first ex-wife, Getskow. At pretrial, defendant moved to exclude Getskow's testimony, initially arguing that he found everything Getskow would testify to "objectionable, with the exception of stuff that is directly related to [defendant] being suicidal or threatening suicide." Defendant argued that "the large majority" of the testimony would be "about [defendant] being controlling and/or manipulative" and asked the court to "have [a] discussion as to whether or not" that testimony would come in. The state responded that it was "not really clear what [defendant was] moving to exclude" because it "was told everything * * * [a]nd then within 60 seconds, [it] was told well not everything." The court and the parties agreed to postpone a discussion regarding the admissibility of Getskow's testimony.

At the later pretrial hearing on defendant's motion to exclude Getskow's testimony, defendant argued that he expected the state to use Getskow's testimony to try to prove that defendant "was controlling and * * * manipulative, and had prevented [Getskow] from seeing her friends, had controlled the family finances, [and] had made up a story about having leukemia and/or being in a car accident to encourage her to go to Germany." Defendant argued that those facts were inadmissible "prior bad acts." However, defendant conceded that because his mental state was at issue, particularly his "neurocognitive disorder [that stemmed] from depression," the "suicidal stuff," *i.e.*, "[t]he drawing [and] the statements he made about the drawing" were admissible. Defendant also stated that "the evidence of [defendant] threatening to crash his car on the Autobahn" would arguably come in as well. The other evidence, however, defendant argued, was prior bad act evidence that would not be admissible to prove motive or intent. He also argued that its probative value was substantially outweighed by the danger of unfair prejudice.

The state responded and conceded that descriptions of defendant's "controlling behavior" would not come into evidence. The state explained that "the majority of the evidence [it would] be eliciting from Ms. Getskow" would be "primarily about [defendant's] response to being told [Getskow was] not coming to Germany" and that she wanted a divorce. The state argued,

"[T]hat's what's important here, in his relationship with [M]. When she said, 'Daniel, it's over,' what kind of behaviors did he engage in? He engaged in controlling, vengeful, vindictive, interspersed with lots of apologies[.] *** And it all led up to him then killing her. ***

"And this all happened after he sustained a traumatic [brain injury], and after he'd been prescribed Topiramate.

"The persuasive, powerful value of how he responded to *** Getskow saying, 'It's over Daniel, I'm not coming to Germany, it's over,' is he engaged in the identical types of behavior [with M]. All of which predated the brain injury, all of which predated *** the Topiramate."

Defendant reiterated his argument that, under OEC 404(3), "evidence of other acts is not admissible to prove the character of a person and to show that the person acted in conformity." Defendant explained,

"The argument has to be that this evidence impacts the discussion on whether or not [defendant] has the ability to form the intent to kill somebody. And saying you have leukemia and you want your wife to come to Germany doesn't have any impact on whether or not he has the intent—or has the ability to form the intent to kill somebody. It is the very definition of what inadmissible prior bad acts is."

The court ruled preliminarily on Getskow's testimony, assuring defendant that it would not allow the state to elicit testimony from Getskow about the entirety of her relationship with defendant. However, the court noted that some of Getskow's testimony "could be highly probative and admissible because it shows something else," for example, absence of mistake or intent. The court "reserve[d] the rest of [its rulings,] giving some direction," and explained that

"it appears to me that, despite the fact that—and I'm setting aside the early information from Ms. Getskow about

early in their marriage that is unflattering, bad acts, but doesn't particularly prove anything. But that the information about how he reacted to the fact that she wanted to not come to Germany and be separated, and then ultimately divorced, *** that is prejudicial. You bet it is. But it is highly probative. And I do not think it's unfairly so, at this point.

"So, we will revisit that if we need to. But right now, we will go forward."

The court also made pretrial rulings that the drawing of defendant's family mourning at his graveside was admissible, as well as the fact that defendant sent the drawing to Getskow.

Finally, during Getskow's testimony, defendant objected to two specific statements that she made. First, defendant objected when Getskow testified that, during their relationship, defendant had threatened to intentionally wreck his car. Second, defendant objected to exhibits accompanying Getskow's testimony: the drawing defendant had sent her depicting his family mourning at his grave, the photograph that was the "basis" for that drawing, and a letter that accompanied the drawing. Defendant referred the trial court to his "previously stated" reasons and arguments that the evidence was inadmissible without further specifying what those reasons were. The trial court overruled defendant's objections.

On appeal, defendant argues that the trial court erred "when it admitted evidence of [his] conduct in his marriage to Getskow." We understand defendant to argue that all of Getskow's testimony was improperly admitted. First, defendant argues that the evidence was not relevant under OEC 401, because it involved behavior that "was too remote in time and too factually distinct from the event here to be probative of defendant's intent at the time that he shot [M]." Second, defendant argues that even if the evidence was relevant, it was inadmissible under OEC 403 because the "probative value of the evidence" was "low relative to its likely prejudicial effect." Third, defendant argues that admission of the evidence was not harmless and, therefore, warrants reversal.

The state responds, in part, that defendant "should not be heard to complain on appeal" because the court's preliminary ruling was "consistent with defendant's own argument" at the hearing regarding the admissibility of Getskow's testimony. The state argues that, "to the extent that defendant intends to argue on appeal that the trial court should have excluded all of the ex-wife's testimony entirely, that argument has been waived or is at least unpreserved." Next, the state argues that the trial court correctly over-ruled defendant's objections because (1) intent was central to the case, and the trial court "limited the risk of prejudice by excluding any evidence about defendant's unattractive behavior before [Getskow] asked for a divorce," and (2) the "remoteness" of the evidence "actually increased the probative value in the circumstances of this case—what made the evidence so relevant was that it predated defendant's TBI and resulting Topiramate use."

We begin with the state's argument that defendant failed to preserve his arguments regarding the admissibility of all of Getskow's testimony. To support his position on appeal, defendant points to the arguments he made during the hearing on his motion to exclude. It is true that defendant made a generalized objection under OEC 404 and OEC 403 during that hearing. However, defendant does not explain how that objection satisfied the requirements of preservation. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (To preserve an argument for appeal, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."). Without an objection to *specific* testimony and an explanation for that objection, any error was not brought to the trial court's attention sufficiently so that it could be corrected. Indeed, the court properly told the parties that they would "revisit the issue" if need be—a fair and sensible approach when the trial court could not determine what, specifically, defendant would be objecting to. *See State v. Coleman*, 130 Or App 656, 663, 883 P2d 266, *rev den*, 320 Or 569 (1994) (court's ruling that did not pre-clude defendant from later objecting to particular portions of

a witness's testimony was "sensible and fair" because, before the witness testified, the court "could not determine, which, if any of the acts she would describe should be excluded"). Thus, to the extent that the state argues that defendant's challenge to the admission of all of Getskow's testimony is unpreserved, we agree.

Our analysis does not end there because, in addition to the generalized objection at the hearing on the motion to exclude, defendant made two specific objections during Getskow's testimony. Those two objections satisfied the preservation requirements. However, on appeal, defendant has failed to assign error to the court's rulings on those two objections or to articulate any arguments that we can fairly interpret as relating to those two specific objections or the court's rulings on them. Because of defendant's failure to comply with ORAP 5.45, we decline to review any portion of defendant's fifth assignment of error that may have been preserved below. *See Strawn v. Farmers Ins. Co.*, 228 Or App 454, 475, 209 P3d 357 (2009), *aff'd in part and rev'd in part on other grounds*, 350 Or 336, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011), *cert den*, 565 US 1177 (2012) (declining to reach claims of error because the noncompliance with ORAP 5.45 rendered the court unable to determine what rulings were being challenged and whether the bases for the challenges were preserved below). Accordingly, we do not reach the two specific objections defendant made during Getskow's testimony.

Affirmed.